J-S86042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.L., BIRTH FATHER | : | No. 1083 WDA 2016 |

Appeal from the Order July 1, 2016
In the Court of Common Pleas of Washington County
Orphans' Court at No(s):  63-OC-2015-0717

BEFORE:  GANTMAN, P.J., MOULTON, J., and STEVENS, P.J.E.*

MEMORANDUM BY GANTMAN, P.J.:          **FILED DECEMBER 13, 2016**

Appellant, D.L. ("Father"), appeals from the order entered in the Washington County Court of Common Pleas Orphans' court, which granted the petition of the Washington County Children and Youth Social Services Agency ("CYS") for involuntary termination of the parental rights Father and K.G. ("Mother") to their minor child, S.L. ("Child").  We affirm.

The Orphans' court correctly sets forth most of the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.[1]  We add Child is two years old and was born in October 2014.  At the time Child was born, Father's and Mother's other children, Child's siblings, had already been adjudicated dependent.  On October 17, 2014, CYS filed

_____

[1] We make one small correction to the court's opinion at page 1.  The court held termination hearings on November 18, 2015, and March 21, 2016.

_____

*Former Justice specially assigned to the Superior Court.

an emergency shelter care motion, which the Court granted. Upon Child's discharge from the hospital after birth, CYS placed Child in foster care.

Procedurally, by memorandum and order dated July 1, 2016, the court granted CYS' petition for involuntary termination of Mother's and Father's parental rights to Child. On July 22, 2016, Father filed a timely notice of appeal and a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i). On August 16, 2016, the court filed a statement, per Pa.R.A.P. 1925(a)(2)(ii), through which the court incorporated by reference its July 1, 2016 memorandum and order. Mother did not file a notice of appeal, and she is not a party to this appeal.

Father raises two issues for our review:

> DID THE [ORPHANS'] COURT ERR IN TERMINATING [FATHER'S] PARENTAL RIGHTS WHERE THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN SUCH A FINDING?
>
> DID THE [ORPHANS'] COURT ERR IN CONCLUDING IT WAS IN…CHILD'S BEST INTERESTS FOR [FATHER'S] PARENTAL RIGHTS TO BE TERMINATED WHERE THERE WAS INSUFFICIENT EVIDENCE FROM WHICH THE TRIAL COURT COULD MAKE ANY CONCLUSIONS ABOUT THE BOND BETWEEN FATHER AND [CHILD]?

(Father's Brief at 7).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare

of the child."

***In re Z.P.***, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting ***In re I.J.***, 972

A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> ***In re B.L.W.***, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*)*, appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> ***In re Adoption of A.C.H.***, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d

1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d

1165 (2008)).

CYS sought involuntary termination of Father's parental rights on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*     \*     \*

**(b)   Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and

welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal **or** failure to perform parental duties. Accordingly, parental rights

- 5 -

> may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or** fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his…conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted) (emphasis added).  Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.  The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his…parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.  *In re A.L.D.*, 797 A.2d 326 (Pa.Super. 2002).  "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental

responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* at 520. Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his…parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively

with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his…physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

"While a parent's emotional bond with his…child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). "The mere existence of an emotional bond does not preclude the termination of parental rights." *Id.* Rather, the court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *Id.* (internal citations and quotation marks omitted). "Above all else[,] adequate consideration must be given to the needs and welfare of the child. A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights."

***In re Z.P., supra*** at 1121.

Importantly, "this Court has recognized a connection between the involuntary termination of parental rights and the Adoption and Safe Families Act ("ASFA")…" ***In re R.M.G.***, 997 A.2d 339, 349 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010). The stated policy of the ASFA is:

> [T]o remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family…. States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require [the Agency] and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. **It is contemplated this process realistically should be completed within 18 months.**

> Essentially, this legislation shifted away from an inappropriate focus on protecting the rights of parents to the priority of the safety, permanency and well-being of the child. While this 18-month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that

the parent will summon the ability to handle the responsibilities of parenting.

*Id.* (internal citations and quotation marks omitted) (emphasis in original).

Instantly, after a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Michael J. Lucas, we conclude Father's issues merit no relief. The Orphans' court opinion comprehensively discusses and properly disposes of Father's issues (*See* Orphans' Court Opinion, filed July 1, 2016, at 16-23) (finding: **(1)** from Child's birth through age of eight months, Father failed to perform regular parental duties; during supervised visits, CYS aide consistently had to prompt Father to care for Child; Father refused to participate fully in interactional evaluation with clinical psychologist; caseworker testified that Father was not compliant with permanency plan; Father failed to avail himself of available services to alleviate conditions which required Child's removal; Father failed to obtain safe, stable, and appropriate housing; Father did not verify he was undergoing mental health treatment for his conditions; no evidence established Father had completed appropriate sex offender course of treatment; caseworker testified that Child would not be safe in Father's care; totality of circumstances warranted involuntary termination of Father's parental rights to Child under 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), and (a)(5); **(2)** no credible evidence demonstrated beneficial bond existed between Father and Child; testimony of case worker demonstrated that, with exception of small number of instances, Father

consistently attended supervised visits with Child; nevertheless, Father attempted to feed Child foods inappropriate for Child's age; Father's interactions with Child indicated he does not have appropriate expectations for Child, given Child's age and limitations; Father was often inattentive to Child during visits, and chose instead to use his cell phone and engage in unwelcome interactions with CYS staff; Father made threatening remarks toward CYS staff; clinical psychologist performed interaction evaluation of Child and his foster parents, who also have custody of Child's siblings; Child has beneficial attachment to his siblings; clinical psychologist opined that Child is healthy and thriving in foster placement; foster mother provides exceptional level of care to Child; termination of Father's parental rights would best serve needs and welfare of Child). The record supports the court's decision. Thus, we affirm on the basis of the Orphans' court opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/13/2016

IN THE COURT OF COMMON PLEAS OF
WASHINGTON COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION

IN THE INTEREST OF:

S. L.                                                       NO. 63-15-0717

MEMORANDUM AND ORDER

Before the court is the petition of the Washington County Children and

Youth Social Services Agency (CYS). CYS seeks to involuntarily terminate the

parental rights of D. L. ("Father") and K. G. ("Mother") to

S. L. ("S.L."), age 20 months.

## PROCEDURAL HISTORY

On June 11, 2015 CYS filed a petition seeking termination. In its petition,

CYS alleged grounds for termination pursuant to 23 Pa.C.S.A. §2511 (a)(1)(2) and

(5). Both parents contested the termination. Hearings in this matter occurred on

November 18, 2015 and March 21, 2015.[1]

---

[1] Due to the medical unavailability of CYS Counsel, an extended recess occurred as CYS had to engage new counsel to complete the case. During that recess, Mother's Counsel also changed.

1

Six (6) days after S.L.'s birth, upon the recommendation of Master Jessica Roberts, this court found that permitting S.L. to remain in the care of his parents was contrary to his best interests and welfare. (See Exhibit 2) In the Shelter Care Order, Master Roberts detailed: i) the dependent status of S.L.'s siblings; ii) Mother's failure to complete ordered services; iii) both parents' mental health treatment needs; iv) Father's status as a registered sexual offender under "Megan's Law;" ; v) Mother's intellectual limitations; vi) the unsanitary condition of Mother and Father's home; vii) Father's reporting that his wife, from North Carolina, had tried to shoot him and his children; viii) Father's threats made to both CYS and to medical providers for Mother; ix) and Mother's inability to understand "basic baby instructions."

On November 13, 2014 Master John Richards conducted a merit hearing that determined issues of dependency and then disposition. Master Richards found that S.L.'s siblings were placed outside the home of Mother and Father and that termination hearings were ongoing with regard to those children. Master Richards found that Mother and Father's home was not safe; that medical providers expressed concerns regarding Mother's understanding of how to care for an infant; that Mother had "unresolved mental health issues;" Father was a registered sex offender who had not completed sexual offender's treatment and had only recently begun mental health treatment. On the basis of Master Richards' recommendation,

2

this Court found that S.L. is a dependent child pursuant to 42 Pa.C.S. § 6302 (1). Master Richards also recommended and the court found that continuing in the home of Mother and Father would be contrary to welfare, health or safety of S.L. Both parents were directed to maintain safe and stable housing. Mother was specifically ordered to undergo a mental health evaluation and an assessment of her intellectual functioning. Father was directed to participate in mental health and sexual offender's treatment. S.L. was placed, with his siblings, into undisclosed CYS Foster Care.

Over the course of the next nine (9) months Master Richards conducted three (3) permanency review hearings.[2] Master Richards found that both Mother and Father were minimally to moderately compliant with the permanency plan for the S.L. Both parents attended in excess of seventy percent (70%) of scheduled visits. Mother was more consistent in visitation with S.L. and during visits she "attended" to S.L. more than Father. However, according to Master Richards the evidence showed that Mother did not always know how to address S.L.'s needs. According to Master Richards concerns persisted with the cleanliness of the parents' home and Father's excessive cell phone use during visits. (See Exhibit 2 Permanency Review Order of 2/12/15 and 5/7/2015). The record of the Permanency Review Hearings did not indicate that either Mother or Father had

---

[2] Hearings occurred on February 12, 2015, May 7, 2015 and August 6, 2015.

3

complied with orders directing them to undergo mental health treatment and Father to complete sexual offenders counseling.

On April 15, 2015, Honorable Katherine B. Emery issued an opinion and order involuntarily terminating the parental rights of Mother and Father to S.L.'s siblings. In her opinion and order, President Judge Emery detailed Mother and Father's history of parental incapacity. Such history included the deplorable condition of the parents' housing dating back to October of 2012; Father's need for mental health treatment as early as 2003; Father's controlling behavior of Mother as reported by hospital personnel; and Father's status as a Tier I Megan's law Offender. President Judge Emery found that neither Mother nor Father "worked with the requisite speed" to achieve reunification. With regard to Father, President Judge Emery found "particularly problematic" his personality disorder which was not responsive to treatment and was "ingrained and lifelong." With regard to Mother, President Judge Emery found that she showed no ability to "independently care for herself" and no capability to "care for two small children." Judge Emery found clear and convincing evidence supported such termination pursuant to 23 Pa.C.S. §2511 (a)(1), (2), (5) and (8).[3] (See Exhibits 3 and 4).

---

[3] In an unreported Memorandum Decision a panel of the Superior Court, being Judges Bowes, Donahue and Fitzgerald, affirmed President Judge Emery's decision on September 24, 2015. (See Exhibits 5 and 6)

4

Following that decision, the Agency requested a finding of Aggravated Circumstances with regard to S.L. On May 7, 2015 Master Richards conducted a permanency review hearing which included consideration of CYS' motion for aggravating circumstances. Mother and Father were found to be minimally compliant with the permanency plan. Master Richards found that Mother and Father had attended twenty-one (21) of twenty-three (23) visits. However, Mother continued to lack knowledge with regard to addressing S.L.'s needs. Master Richards found that Father continued to "play on his cell phone" during visits and lacked knowledge in attending to S.L. when S.L. was "fussy." Master Richards found that both parents had achieved only minimal progress towards alleviating the circumstances which necessitated placement. Intellectual testing of Mother revealed that she has an IQ of 58 and that her judgment and insight is consistent with that level of intellectual functioning. Though Father reported a new address in Waynesburg, Pennsylvania, mail directed there had been returned to CYS with the postal markings "no such number." Having been informed of President Judge Emery's decision in the termination proceedings, Master Richards recommended and this Court found that aggravating circumstances existed. CYS was relieved of the obligation to make efforts to reunify S.L. with his parents.

On June 10, 2015, CYS filed a petition for involuntary termination of parental rights for both Mother and Father. CYS alleged that: Mother and Father's

5

parental incapacity had persisted; they had failed to perform parental duties: due to parental incapacity S.L. has been without essential parental care; and that Mother and Father could not or would not "remedy" those conditions within a reasonable time.

On August 6, 2015 a third permanency review hearing occurred. Despite notice, neither Mother nor Father, attended the hearing. Master Richards found that both parents continued to attend visits with S.L. However, Master Richards also reported both parents required prompting from case aides during visits. On three (3) separate occasions the parents "had to be told" that S.L. needed sunscreen when the parents wished to take him outside. At another visit, Mother attempted to clean S.L's baby teeth with an electric toothbrush which was too hard for him. The parents attempted to feed S.L, an infant between the ages of seven (7) and ten (10) months an assortment of "junk food" to include Twinkies®, french fries and little huggie® drinks. At visits, Father continued to spend significant periods of time on his cell phone and a laptop. Master Richards recommended continued placement of S.L. and supervised visitation for both parents. (See Exhibit 2, August 6, 2015 Order).

At the November 18, 2015 hearing, Father objected to the admission of the procedural record of S.L.'s dependency proceedings. In a very broad objection, Father asserted that his Due Process rights were violated in those

6

proceedings by the admission of evidence pursuant to Pa.R.J.C.P. 1608(c). Father argued that admission of the court's orders from permanency review hearings included the admission of factual findings that are not admissible in either an adjudicatory hearing or a termination of parental rights proceeding. Further, throughout the hearings in this matter, both Mother and Father argued that grounds for the termination of their parental rights had not been established by clear and convincing evidence.

Before the court are three (3) issues for determination:

1)  Whether the court may properly admit and give consideration to the court orders issued in S.L.'s dependency proceedings?

2)  Whether CYS proved by clear and convincing evidence grounds for the termination of parental rights pursuant to 23 Pa.C.S.A. § (a)(1), (2) and/or (5)?

3)  If the Agency has met its burden of proof regarding involuntary termination of parental rights, then whether termination serves the needs and welfare of S.L., pursuant to Section 2511(b)?

## ADMISSIBILTY OF PERMANENCY REVIEW ORDERS

In a termination proceeding the Orphans' court must examine competent, relevant evidentiary resources. In re Adoption of B.G.S., 418 Pa.Super. 588, 614

7

A.2d 1161 (1992), appeal discontinued, 535 Pa. 628, 631 A.2d 1002 (1993). Pennsylvania law allows the admission in such proceedings of a lay witness' testimony on a party's parental capability, when that testimony is based on personal observation. For instance, evidence of the parent's family history of mental illness and involvement with the welfare system is also relevant and admissible regarding issues of family stability or lack of a social support system to assist the parent with the child. In re A.L.D., 2002 PA Super 104, 797 A.2d 326, 337-38 (Pa. Super. 2002) (citations omitted) Further, evidence of a parent permitting a convicted drug offender to have access to a child's home is relevant in a termination proceeding. In re Adoption of M.A.R., 405 Pa.Super. 131, 591 A.2d 1133 (1991).

Pa.R.E. 201(b) provides that "a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Pursuant to Pa.R.E. 201 (b) a court may take judicial notice of another case to include rulings made by the court in another proceeding.

In this case, CYS requested that this court take judicial notice of the orders issued by this court in the dependency proceeding involving the same parties. No appeal of the orders were taken by any party to include Mother and Father. This court issued those orders upon recommendation of the assigned hearing masters.

8

The existence of the contents of such orders were capable of ready and accurate determination by review of the Clerk of Courts file and the CPCMS database.

A Court may not take judicial notice that the factual findings that led to the prior rulings are true unless the party against whom judicial notice is taken was a party to the prior litigation. In such cases, judicial or collateral estoppel may apply. See Binder on Pennsylvania Evidence §2.01(b). For instance, a trial court's ruling to take judicial notice of the fact that it ruled against a party in a prior custody dispute is not erroneous. V.B. v. J.E.B., 55 A.3d 1193, 1206-07 (Pa. Super. 2012). However, in contrast to merely taking judicial notice of its prior ruling, a trial court commits reversible error by incorporating the entire file of an unrelated custody litigation into a new dispute by reference and by relying upon its prior findings of facts to reach its determination. See 220 Partnership v. Philadelphia Elec. Co., 437 Pa.Super. 650, 650 A.2d 1094, 1097 (1994) ("Where material facts are in dispute, judicial notice may not be used to deny a party an opportunity to present contrary evidence").[4]

---

[4] 220 Partnership involved a trial court's dismissal of a complaint upon preliminary objections. In that case the Superior Court directed that the defense of collateral estoppel should have been raised in an answer on the merits. Cf. Pa.R.C.P. 1030 (res judicata). The Superior Court cautioned "if there be any dispute as to the facts supporting such a defense, they can be raised and adjudicated in an appropriate manner in the litigation. The trial court should not, at the preliminary objection stage of this action, have accepted as true facts which were in direct conflict with the well pleaded facts of the complaint. Where material facts are in dispute, judicial notice may not be used to deny a party an opportunity to present contrary evidence." See: Wells v. Pittsburgh Board of Public Education, supra 31 Pa.Commw. at 5, 374 A.2d at 1011.

9

In this case, this court admitted as Exhibit 2 the court orders issued in the dependency proceeding involving S.L. Such proceedings are not unrelated to the present action to pursue a termination of parental rights. The parties are the same. The issues are related. Such evidence is relevant because it informs the trier of fact as to the reasons that necessitated S.L.'s removal from care; to show what if any parental incapacity has existed; what progress towards reunification was made and whether S.L. has been safe in foster placement.

Judicial notice may not be carried so far as to make it impossible for an appellate court to determine upon what basis factual findings were made. This, coupled with a denial of opportunity to introduce contrary evidence or engage in cross-examination, would be a denial of due process. Alko Express Lines v. Pennsylvania Public Utility Commission, 152 Pa.Super. 27, 30 A.2d 440 (1943) as cited in Wells v. Pittsburgh Bd. of Pub. Ed., 31 Pa.Cmwlth. 1, 5, 374 A.2d 1009, 1011 (1977).

However, the record of this termination proceeding and in particular the case in chief offered by CYS did not merely present the record of the prior dependency proceedings. Substantial competent testimony, from a clinical psychologist, a case aide, the foster placement provider, the caseworker, Mother and Father was

220 P'ship v. Philadelphia Elec. Co., 437 Pa.Super. 650, 656-57, 650 A.2d 1094, 1097 (1994)

10

presented by CYS in this termination proceeding. Mother and Father, each, were given the opportunity to present evidence that contradicted the specific factual findings made in the dependency proceeding. In reaching a decision, this court does not merely rely upon the record of the dependency proceeding. As discussed below, consideration was given to all testimony and evidence presented in the termination hearing.

When making a decision as to the current best interests of the children, a trial judge can consider the history of the parties. Incorporating the prior testimony between the parties from prior proceedings "is an intelligent and efficient way to proceed." Jones v. Jones, 2005 PA Super 337, 884 A.2d 915, 916-17 (Pa. Super. 2005).

Furthermore, this court has not credited nor relied upon the reports of Stacy Frye, a sexual offender counselor. Ms. Frye did not appear and testify at any dependency proceeding. Though Master Richards discussed Ms. Frye's reported opinions in making findings regarding compliance and progress, this court in deciding this case gave Ms. Frye's opinion no weight.[5]

_____

[5] Such a determination should not surprise CYS, the Guardian Ad Litem and counsel for both parties. At the March 21, 2016 hearing, the court took considerable effort to identify the precise scope of Father's objection to the Dependency Court Orders. Based upon statements of Father's Counsel such objection was to any reliance this court would place on findings from the Dependency orders that were based upon Stacy Frye's reports. At the conclusion of that hearing,

11

An evidentiary ruling which does not affect the decision will not provide a basis for disturbing the fact-finder's judgment. Hart v. W.H. Stewart, Inc., 523 Pa. 13, 16, 564 A.2d 1250, 1252 (1989) as cited in In re M.T., 414 Pa.Super. 372, 392, 607 A.2d 271, 281 (1992).

For these reasons, the court orders issued in the underlying dependency proceeding were admitted.[6]

## BURDEN OF PROOF

The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. In re Adoption of A.C.H., 803 A.2d 224, 228 (Pa.Super.2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re*

---

Father's counsel indicated that he did not know if his client had been successfully discharged from offender's treatment. Father's Counsel persisted in making this argument despite the testimony of Mother, Ms. Everly, Father and Caseworker Smith. Father's Counsel appeared to misapprehend that Father's testimony was presented as part of CYS' case in chief. Such argument clearly is not supported by the record presented during the termination proceedings. Further, such argument by Father's Counsel misstated the testimony that Father had given only minutes earlier in the proceeding. Father specifically admitted he had not completed any sexual offender treatment and added he only had three more years of registry.

[6] Additionally, Father's Counsel could not point to any record of timely objections made to factual findings of the Court during those proceedings. Father did not request reconsideration of those orders and did not file an appeal regarding those orders.

12

*J.D.W.M.,* 810 A.2d 688, 690 (Pa.Super.2002) as cited in In re Z.P., 2010 PA
Super 56, 994 A.2d 1108, 1116 (Pa. Super. 2010).

Parental rights may be involuntarily terminated where any one subsection of
Section 2511(a) is satisfied, along with consideration of the subsection 2511(b)
provisions. In re Adoption of R.J.S., 901 A.2d 502, 508 n. 3 (Pa.Super.2006).

The statute permitting the termination of parental rights outlines certain
irreducible minimum requirements of care that parents must provide for their
children, and a parent who cannot or will not meet the requirements within a
reasonable time following intervention by the state may properly be considered
unfit and have his parental rights terminated." *In re B.L.L.,* 787 A.2d 1007, 1013
(Pa.Super.2001) as cited in In re Z.P., 2010 PA Super 56, ¶ 15, 994 A.2d 1108,
1118 (Pa. Super. Ct. 2010).

## (A)(1) TERMINATION

A court may terminate parental rights under Section 2511(a)(1) where the
parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails
to perform parental duties for at least the six months prior to the filing of the
termination petition. The court should consider the entire background of the case
and not simply: mechanically apply the six-month statutory provision. The court
must examine the individual circumstances of each case and consider all

13

explanations offered by the parent facing termination of his ... parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. In re Z.P., 994 A.2d 1108, 1117 (Pa. Super. 2010) (citations omitted).

**(A)(2)**

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." In re A.L.D., 797 A.2d 326, 337 (Pa.Super.2002). Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.**

In re E.A.P., 944 A.2d 79, 82 (Pa.Super.2008) (internal citations and quotation marks omitted) (emphasis added). Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts

14

may be insufficient to remedy parental incapacity under subsection (a)(2). In re Adoption of M.J.H., 348 Pa.Super. 65, 501 A.2d 648 (1985). *See also* Matter of Adoption of C.A.W., 453 Pa.Super. 277, 683 A.2d 911, 916 (1996). "Parents are required to make diligent efforts toward the reasonably *1118 prompt assumption of full parental responsibilities." In re A.L.D., *supra* at 340. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.* 1516 Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. In re Adoption of Michael J.C., 506 Pa. 517, 525, 486 A.2d 371, 375 (1984). As our Supreme Court explained, if the statute required physical custody as a prerequisite, termination of parental rights would only result after a child has suffered physical, emotional or mental damage. We cannot agree. Neither the language of the Act, nor our case law, supports appellee's position that Section 2511(a)(2) requires a showing that a putative parent have an opportunity to inflict substantial physical or mental harm upon a child before the state can intervene. Rather, a more appropriate reading of the statute is that when a parent has demonstrated a continued inability to conduct his ... life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is

15

irremediable as supported by clear and competent evidence, the termination of parental rights is justified. In re Z.P., 994 A.2d 1108, 1117-18 (Pa. Super. 2010)

**(A)(5)**

Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(5). In re Z.P., , 994 A.2d 1108, 1118 (Pa. Super. 2010).

With regard to S.L., CYS has met its burden by clear and convincing evidence with regard to subsections (a)(1), (a) (2) and (a) (5). From S.L's birth through the age of 8 months, neither Mother nor Father performed regular parental duties for S.L. Following his birth and discharge from the hospital, S.L. was placed into foster care S.L. and at the time of the first hearing had remained in that care of thirteen (13) months. (H.T. 11/18/15 p. 170) On multiple occasions, upon a hearing Master's recommendation, the court determined that S.L. could not safely be within Mother and Father's care. (H.T. (See Exhibit 2) In visits, Mother and Father consistently had to be prompted in their care for S.L. Mother and Father

16

refused to fully participate in an interactional evaluation with Dr. Neil Rosenblum, a clinical psychologist. (H.T. 11/18/15,p. 35-36 )

As Caseworker Dawn Smith testified, Mother and Father were not compliant with the permanency plan for S.L. Services were made reasonably available to the parents to assist them in alleviating the conditions that required S.L.'s removal. However, the parents did not avail themselves of those services in a timely manner. A reasonable period of time has passed for the parents to otherwise alleviate the circumstances that caused S.L.'s removal.

Unfortunately, the parents have failed to otherwise remedy those conditions. (H.T. 11/18/2015 p. 204-205, Exhibit 2) Neither parent timely obtained safe, stable and appropriate housing. (H.T. 11/15/2015 p. 191-192) As of November 18, 2015 Father had not provided CYS or the court with any information verifying that he was undergoing mental health treatment. (H.T. 11/15/2015 p. 188). Father's testimony confirmed that he has been diagnosed with "multiple different things." At the March 21, 2016 hearing Father presented the testimony of a counselor, Emma Everly, from whom he had sought treatment At the time of the hearing, Ms. Everly was not a licensed clinical psychologist. Ms. Everly indicated that she began treating Father in April of 2015 and that such treatment included cognitive behavior therapy and eye movement desensitization processing. Ms. Everly reported that Father's thoughts were stimulated by his post-traumatic stress

17

disorder. Ms. Everly also indicated that Father suffers from bi-polar disorder. Father confirmed he underwent no other treatment than the counseling provided by Ms. Everly. No evidence credibly and persuasively established that Father, a convicted sexual offender subject to Megan's Law, completed an appropriate course of treatment for sexual offenders. (H.T. 11/18/2015 p. 195) Ms. Everly and Mother both confirmed that Father had not completed sexual offenders' treatment. (H.T. 11/18/2015 p. 296). Father testified that he "only has three (3) more years of registry."

Mother similarly did not alleviate the conditions which prompted S.L.'s removal form her care. Mother testified that an FBI Agent placed her in Father's custody. (H.T. 11/18/2015 p. 333) She conceded that she suffers panic attacks and did not undergo a mental health evaluation as directed. (H.T. 11/18/2015 p. 190 and 323-324). In visitations, Mother did not exhibit a necessary understanding of S.L.'s age and developmental limitations. (H.T. 11/18/2015 p. 196) Mother has no consistent source of income, lacks a birth certificate, is intellectually limited is very reliant upon Father, a convicted sex offender, for guidance and support. (H.T. 11/18/2015 p. 195-200, 313 and 362) Mother admitted to feeling "trapped in her current situation." (H.T. 11/18/2015 p. 314) During her testimony she misstated S.L.'s birth date. (H.T. 11/18/2015 p. 294 and 339) Mother acknowledged having given birth to three (3) other children, none of whom are in her care. (H.T.

18

11/18/2015 p. 294-295) Mother conceded that S.L. gained a benefit by being with his siblings. (H.T. 11/18/2015 p. 315) In response to a question whether breaking S.L.'s bond with Father would be detrimental, Mother responded that she believed that if that occurred S.L. would need counseling. (H.T. 11/18/2015 p. 348)

Ms. Smith unequivocally and credibly testified that S.L.'s needs and welfare would be best served by termination of his parents' parental rights. (H.T. 11/18/2015 p. 205) Caseworker Smith indicated that S.L. would not be safe in the care of Mother and Father. (H.T. 11/18/2015 p. 205 lines 11 to p.206 line 4) Ms. Smith testified that no beneficial relationship existed between the S.L. and his birth parents. She added S.L. would suffer no detrimental effect if parents' rights were terminated. (H.T. 11/18/205 p. 206-209)

The totality of the circumstances presented warrants the involuntary termination of both Mother and Father's rights to S.L. pursuant to 23 Pa.C.S.A. § 2511 (a)(1),(2) and (5).

**2511(b)**

The court must consider whether termination serves the needs and welfare of the child, pursuant to Section 2511(b). Relative to Section 2511(b), the Superior Court has provided the following guidance:

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also

19

discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

In re C.P., 901 A.2d 516 (Pa.Super.2006). The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the individual needs and welfare of the child. In re C.L.G., 956 A.2d 999, 1009-10 (Pa. Super. 2008) (citations omitted).

In this case, no credible and persuasive evidence was presented that demonstrated the existence of a beneficial bond between S.L. and his parents. Due to the parents' refusal to fully participate in Dr. Rosenblum's interactional evaluation, no expert opinion was provided regarding the parents' relationship with S.L. Testimony from Erin Dixon, CYS case aide, was provided regarding the parents' supervised visits. The parents with the exception of only a small number of instances, have consistently participated in supervised visits with S.L. two (2) times per week for two (2) hours. (H.T. 11/18/2015 p. 88-89) According to Ms. Dixon, the parents do attend visits with supplies to care for S.L. and brought a toy and cakes for S.L.'s birthday. However, Ms. Dixon added that the parents attempted to feed S.L. "Fun-Dip",French fries and peanuts which are not age

20

appropriate for S.L. (H.T. 11/18/2015 p. 94-96) According to Ms. Dixon, the parents do not have appropriate expectations for S.L. given his age and limitations. (H.T. 11/18/2015 p. 98-99) For instance, at age six (6)months, Mother inquired whether S.L.'s teeth were being brushed. At that time, S.L. had no teeth. (H.T. 11/18/2015 p. 105) Case Aide Erin Dixon reported that S.L. does smile when he sees Mother and Father at the start of a visit and smiles when he returns to the Case Aide at the end of a visit. (H.T. 11/28/2015 p. 106) Case Aide Dixon expressed concern regarding unsupervised visits for both parents. Her concerns centered chiefly around the parents providing S.L. inappropriate foods. For instance, on one (1) visit the parents fed S.L. yogurt. S.L. then encountered a severe episode of diarrhea. When the Case Aide Dixon advised the parents how poorly S.L. tolerated the yogurt Father replied that he would continue giving S.L. yogurt so that the foster parents would have something "to clean up." (H.T. 11/18/2015 p. 144-145)

During visits, Father is less attentive to S.L., and often chooses to use his cell phone and interact with CYS staff. Father's discussions with CYS staff were not described as being invited or welcomed by staff. Father attempted to discuss his lawsuit against CYS and the research he has done regarding S.L.'s undisclosed foster placement. (H.T. 11/18/2015 p. 100-101) Father spends nearly "50%" of time at visits attempting to engage CYS staff in discussions. Such discussions

21

include his disclosure of Facebook research he has done on staff members and their families; threats to kill or jail other CYS staff and locations on county grounds that would be a "perfect spot" for the placement of a .50 caliber weapon. (H.T. 11/18/2015 p. 102-103, 147).

Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. In re T.S.M., 620 Pa. 602, 629, 71 A.3d 251, 268 (2013). In this case, Dr. Rosenblum performed an interactional evaluation that included both he and his foster parents. (H.T. 11/18/15 p.44) Dr. Rosenblum reported that S.L.'s foster parents also have custody of S.L.'s older siblings. Dr. Rosenblum's evaluation included observations of S.L.'s interaction with his siblings. Dr. Rosenblum reported that an attachment between S.L. and his siblings is present and beneficial to S.L. (H.T. 11/18/2015 p. 49) Dr. Rosenblum opined that S.L. is a "very healthy child, "thriving in his present placement," who is "exceptionally friendly." (H.T. 11/18/2015 p.45) Dr. Rosenblum informed the court, that foster mother is home on a full-time basis and is very responsive to S.L. Dr. Rosenblum described the environment in the foster home which is "very supportive and nurturing", which meets his "needs and welfare" and which provides S.L. an exceptional level of care. (H.T. 11/18/2015 p. 45-46 and 48). Dr. Rosenblum explained that after the age of 18 months S.L. will find it

22

increasingly difficult to tolerate separation from his primary caregivers who are his foster parents. (H.T. 11/18/2015 p. 47) Dr. Rosenblum stressed that "timely" permanency for S.L. was important for his "psychological needs." (H.T. 11/18/2015 p. 50) Dr. Rosenblum concluded that S.L. is "thriving in his current environment." (H.T. 11/18/2015 p. 46 lines 16-18)

For these reasons, the Court finds that termination will best serve the individual needs and welfare of S.L.

## ORDER

AND NOW, this 29th day of June, 2016 the court finds that pursuant to 23 Pa.C.S.A. §2511 (a)(1), (2) and (5) CYS has proven, by clear and convincing evidence, the requisite elements to terminate the parental rights of Mother, K. G., and Father, D. L., to Child, S. L. Further, pursuant to 23 Pa.C.S.A. §2511 (b) this Court finds that termination of parental rights best serves the individual needs and welfare of S.L. Termination is necessary to provide S.L. with a permanent, healthy and safe environment.

BY THE COURT

_____ J.

MICHAEL J. LUCAS

23